IN RE: Stephan Donald CLEVELAND, Debtor.

Stephan Donald Cleveland, Plaintiff,

v.

Educational Credit Management Corporation (ECMC), RBS Citizens NA, Key Bank USA, National Collegiate Student Loan Trust, and Transworld Systems, Inc., Defendants.

CASE NO. 15–52571–WLH
ADV. PROC. NO. 15–5237–WLH

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Signed September 16, 2016

---

**113.** District Court Case 2:14-cv-00335-SPC, Doc. No. 16.

**114.** Doc. No. 82.

Howard P. Slomka, Slomka Law Firm, Atlanta, GA, for Plaintiff.

Thomas W. Joyce, Jones, Cork & Miller LLP, Macon, GA, Craig B. Lefkoff, Lefkoff, Rubin, Gleason & Russo, PC, Atlanta, GA, for Defendants.

RBS Citizens NA, Riverside, RI, pro se.

Key Bank USA, Cleveland, OH, pro se.

## ORDER AFTER TRIAL

Wendy L. Hagenau, U.S. Bankruptcy Court Judge

The Debtor's Complaint to determine the dischargeability of certain student loans came before the Court for trial on September 7, 2016. For the reasons stated below, judgment is entered for Defendants Educational Credit Management Corporation and National Collegiate Student Loan Trust 2007–3, 2006–3 and 2006–2.

## PROCEDURAL HISTORY

The Debtor filed his Chapter 7 case on February 9, 2015. The adversary proceeding to determine the dischargeability of certain student loans was filed on May 15, 2015. Plaintiff dismissed Transworld Systems, Inc. on June 11, 2015, and RBS Citizens N.A. on September 6, 2016. A consent judgment against Key Bank USA was entered on June 2, 2016, finding that the student loans held by Key Bank were dischargeable. The matter proceeded to trial only as to Defendants Educational Credit Management Corporation ("ECMC") and National Collegiate Student Loan Trust 2006–2, 2006–3 and 2007–3 ("NCSLT"). Howard Slomka appeared on behalf of the Plaintiff Debtor, Thomas W. Joyce appeared on behalf of ECMC, and Craig B. Lefkoff appeared on behalf of NCSLT. This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1334 and 157 and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I) as a matter to determine the dischargeability of debts.

## FINDINGS OF FACT

In July 2001, the Debtor began college at Broward Community College ("BCC") to obtain an associate degree in Professional Pilot Technologies. He would also obtain a pilot's license as part of this program. The Debtor chose to attend BCC to obtain his pilot's license because he eventually wanted to obtain a bachelor's degree, and he wanted college credit for the flight courses. He also chose BCC through which to obtain his pilot's license because he could get more in student loans than if he simply attended a "mom and pop" flight school. The Debtor graduated from BCC in 2005 with honors, a 3.6 GPA, and an associate degree in Professional Pilot Technologies. The Debtor later graduated in 2007 from Embry–Riddle Aeronautical University in Fort Lauderdale, Florida with a BS in Professional Aeronautics.

In order to attend school, the Debtor took out ten student loans beginning in July 2001 through "Nelnet". All ten loans were consolidated on August 30, 2007 in a "Federal Consolidation Loan" identified as being under the Federal Family Education Loan Program ("FFELP"). Under the terms of the consolidated loan, the Debtor chose a "graduated" repayment plan. The principal amount of the loans consolidated was $18,427.00. ECMC was the guarantor of the loan. The Debtor made no payments on the consolidated loan. The Debtor did not enroll in any alternative repayment plans. Consequently, in November 2014, ECMC began to garnish the Debtor's wages. The garnishment prompted the Debtor to file this bankruptcy case. As of the trial date, ECMC was owed $41,636.23.

In addition to the ECMC loans, the Debtor obtained three loans through NCSLT. A loan in the amount of $30,000 was disbursed to the Debtor on February 27, 2006. A loan in the amount of $10,000 was disbursed to the Debtor on August 28,

2006. Another loan in the amount of $10,000 was disbursed to the Debtor on June 19, 2007. All three NCSLT loans were guaranteed by The Education Resources Institute, Inc., a non-profit organization. The loan documents for the NCSLT loans reflect the schools the Debtor would be attending were the Embry–Riddle Aeronautical University and BCC. No payments were made on the loans. The Debtor did not enroll in any alternative repayment plans. The outstanding balance owed to NCSLT as of the trial date was $95,663.21.

The Debtor contends that over $70,000 of the student loans he obtained from various sources was paid to Comair Aviation Academy which subsequently became known as Delta Connection Academy ("DCA"). His proof of this fact is a list of receipts provided by BCC which the Debtor contends includes payments he remitted to BCC which then paid them to DCA. The Debtor testified that DCA was an independent contractor hired by BCC to conduct the flight training courses. Nevertheless, the Debtor testified that all payments he made were to BCC, his grades, his report card and his diploma are all from BCC, and his DCA credits applied as BCC college credit for graduation. Although students could have enrolled directly in DCA, he chose not to do so because he wanted college credit for the courses.

After graduation, the Debtor worked as a flight instructor until 2011. In 2011, he was hired by Silver Airways as a prop plane pilot for $18 an hour. In April 2014, he was hired by Express Jet and is currently employed as a co-captain, or first officer, there. The Debtor holds numerous certifications as a pilot and flight instructor.

As of the petition date, the Debtor was a 46–year–old single man with no dependents. His income reported on Schedule I was $1,328.88 a month, plus his father contributed $300–$600 a month. His expenses as of the petition date were reported to be $1,880, including $745 for an apartment and $381 for a car payment. After the filing of the petition, though, various positive changes occurred for the Debtor. First, he received a raise from $23 an hour to $42 an hour in April 2015 (his one-year employment anniversary). Second, his car was paid off in August 2015. Third, the Debtor moved to a new apartment with the rent increasing to $1,100 a month. The Debtor's 2015 tax return showed gross income of $34,486 (about a $12,000 increase over the prior year). The Debtor's pay stubs for 2016 year-to-date as of August 31 showed total income of $36,489.42, including reimbursements, bonus ($750), etc. This equals about $4,561 a month gross income, or $54,733 a year. The Debtor's year-to-date net income through August 31 was $26,529, or approximately $3,316 a month. This represents an almost $2,000 a month increase in the Debtor's net income just since the filing of the petition. The Debtor has also worked out a repayment agreement with the IRS for $170 per month to be paid over a five-year period.

The Debtor's main reason for believing that repayment of the student loans is an undue hardship is because his future prospects are not as rosy as he expected. The Debtor explained that airline pilots with major airlines such as Delta, American or United make several hundred thousand dollars a year. However, due to the Debtor's age, economic circumstances and changes in the airline industry, the Debtor's prospects for reaching his goal of being a pilot with a major airline have diminished. The Debtor has only 18 more years to be a pilot as the present mandatory retirement age for pilots is 65. The Debtor also explained that, due to the recession in

2008 through 2010, the increased retirement age for airline pilots from 60 to 65 and the restriction of routes flown by the major airlines (which leads to more routes for the regional airlines), fewer pilot positions are available at the major airlines. The Debtor testified that pilots with a military pilot background tend to have preference over civilian pilots such as the Debtor. The Debtor expects to remain in his role as first officer at Express Jet for at least another five years. He does not expect any major increase in income during that time, just cost of living adjustments. To become a pilot at Express Jet or a similar regional airline generally requires seven to eight years. Assuming the Debtor becomes a pilot at Express Jet in another five years, his salary would be somewhere in the $65,000 to $70,000 range at the outset. At present, the top salary for a pilot at Express Jet is $110,000. The Debtor also testified he cannot take a second job because he is on "reserve" which means he must be available to take flights whenever he is called. He did note, however, that other pilots work a second job doing something such as consulting where their time is flexible. Finally, the Debtor noted that his car is quite old, needs repairs, and eventually will need to be replaced.

## LEGAL ANALYSIS

■■■ In a complaint to determine dischargeability under the "undue hardship" exception of 11 U.S.C. § 523(a)(8), the burden of proof is divided between the parties. See In re Webb, 132 B.R. 199, 201 (Bankr. M.D. Fla. 1991) (citing In re D'Ettore, 106 B.R. 715, 717 (Bankr. M.D. Fla. 1989)). The initial burden is on the lender to establish the existence of the debt and to demonstrate that the debt falls within the scope of Section 523(a)(8). In re Rumer, 469 B.R. 553, 561 (Bankr. M.D. Pa. 2012) (collecting cases). If the lender meets its burden, the burden then shifts to the debtor to prove "undue hardship" by a preponderance of the evidence. D'Ettore, 106 B.R. at 718; In re Binder, 54 B.R. 736, 739 (Bankr. D.N.D. 1985); In re Brightful, 267 F.3d 324, 327 (3d Cir. 2001). Because the applicability of Section 523(a)(8) must be established before the Debtor is required to prove undue hardship, this will be addressed first.

1. The ECMC and NCSLT loans are the type of loans that are non-dischargeable under Section 523(a)(8).

The Debtor does not dispute the existence or amount of the loans, but argues that all or a portion of the student loans are actually dischargeable because a certain amount of each of them was used to pay DCA, which is not a qualified educational institution as required under 11 U.S.C. § 523(a)(8)(B). Section 532(a)(8) provides:

A discharge ... does not discharge an individual debtor from any debt—unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—

(A) (i) an educational benefit overpayment or loan, made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

(ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual;

The Debtor argues that, because DCA is not a qualified institution, the loans are not

qualified education loans and are therefore dischargeable under Section 523(a)(8)(B).

■ The current version of Section 523(a)(8) was adopted in 2005 as part of BAPCPA. Prior to BAPCPA, Section 523(a)(8) included only the provisions of what is now Section 523(a)(8)(A). BAPCPA added (B) to the Section, and it expands the types of loans that are not dischargeable. See e.g., In re Decena, 549 B.R. 11 (Bankr. E.D.N.Y. 2016). The text of the statute clearly provides for three alternative ways that a loan may be considered non-dischargeable. It may be (i) an educational loan that is a qualified education loan or (ii) an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit or made under any program funded in whole or in part by a governmental unit or non-profit institution or (iii) an obligation to repay funds received as an educational benefit, scholarship or stipend. A failure of a loan to qualify under one of the provisions does not eliminate the possibility of it qualifying as non-dischargeable under the other provisions. To read the section the way the Debtor suggests and limit all non-dischargeable loans to only qualified education loans would limit the loans that are non-dischargeable and have historically been non-dischargeable under the Section 523(a)(8). The Court concludes this construction is not consistent with the clear meaning of the statute or with the intent of Congress.

■ Here, the ECMC loan is made under the FFELP, which is a program funded in whole or in part by a governmental unit. The NCSLT loans were made under a program funded in whole or in part by a non-profit institution, in this case, The Education Research Institute, Inc. Consequently, all of the loans of ECMC and NCSLT qualify to be non-dischargeable under Section 523(a)(8)(A)(i).

## 2. Repayment of the loans does not create an undue hardship.

■ To determine whether the exception of a student loan from discharge will impose an "undue hardship" on a debtor, the Eleventh Circuit has adopted the three-part test that was first articulated in Brunner v. New York State Higher Education Services Corp., 831 F.2d 395 (2d Cir. 1987). See Hemar Ins. Corp. of America v. Cox (In re Cox), 338 F.3d 1238, 1240 (11th Cir. 2003) (adopting the Brunner test for undue hardship). To establish hardship under the Brunner test, the debtor must show:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loan.

Id. at 1241. A debtor must satisfy all three elements of the Brunner test in order to have his loans discharged. In re Roberson, 999 F.2d 1132, 1135–36 (7th Cir. 1993).

### A. Minimal Standard of Living

■ Under the first prong of Brunner, the court must examine "the debtor's current financial condition to see if payment of the loans would cause his standard of living to fall below that minimally necessary." Roberson, 999 F.2d at 1135. Satisfying this prong "requires more than a showing of tight finances." In re Faish, 72 F.3d 298, 306 (3d Cir. 1995). Determining whether repayment of a student loan will deprive the debtor of a minimal standard of living requires consideration of the debtor's household income and those expenses

necessary to meet his or her basic needs. Miller v. Sallie Mae, Inc. (In re Miller), 409 B.R. 299, 312 (Bankr. E.D. Pa. 2009); Grove v. Educ. Cred. Mgmt. Corp. (In re Grove), 323 B.R. 216, 224 (Bankr. N.D. Ohio 2005); Murphy v. U.S. Dept. of Educ. (In re Murphy), 305 B.R. 780, 793 (Bankr. E.D. Va. 2004). One court identified elements of a minimal standard of living as:

1. Shelter that is furnished, clean, and free of pests with regulated heating and cooling;

2. Basic utilities such as electricity, water, gas and telephone;

3. Food and personal hygiene products;

4. Transportation or vehicles (plus service and insurance);

5. Life insurance and health insurance;

6. Modest recreation.

Ivory v. U.S. Dept. of Educ. et al. (In re Ivory), 269 B.R. 890, 899 (Bankr. N.D. Al. 2001).[1]

■ Here, the Debtor's Schedule J shows his expenses were $1,880 as of the petition date, including a car payment. Since this date, the car has been paid in full, but his rent increase is about the same as the car payment. The Debtor testified his expenditures run about $2,000 a month. The Debtor's current net income is approximately $3,300 a month. The Court finds the Debtor has approximately $1,300 a month in extra net income that could be used towards payment of debt. Even with the IRS payment of $170, there is still $1,130 a month presently available from the Debtor's income for repayment of student loans. Therefore, the Court concludes the Debtor has not carried his burden of establishing that the Debtor's current financial condition is such that repayment of the loans would cause his standard of living to fall below that minimally necessary.

### B. Persistent State of Affairs

■ The second prong of the Brunner test requires the debtor to prove that there are additional circumstances that indicate that this "state of affairs is likely to persist for a significant portion of the repayment period of the student loans." Brunner, 831 F.2d at 396. Courts have stated that a student loan may not be discharged based simply on a "present inability to fulfill [the] financial commitment." In re Brightful, 267 F.3d 324, 328 (3d Cir. 2001); see also Macon v. U.S. Dept. of Educ. (In re Macon), 2014 WL 5080410, at *3 (Bankr. N.D. Ga. Oct. 6, 2014). Many courts look to a list of additional circumstances that includes: whether the debtor suffers from a disability; obligations to care for dependents; the quality and degree of education; nature of job skills; underemployment; number of years remaining in work life to repay the loan; age and ability to relocate; lack of assets which could be used to pay the loan; probability of increasing expenses; and whether better financial options exist elsewhere. See Nys v. Educ. Cred. Mgmt. Corp. (In re Nys), 308 B.R. 436, 446 (9th Cir. BAP 2004), aff'd 446 F.3d 938 (9th Cir. 2006).

The Court has already concluded the Debtor does have an ability to make payments on his student loans. Moreover, the Debtor's current financial condition is not "persistent" under the evidence presented. First, the Debtor's $20,000 increase in pay

---

1. The date to be used in determining "current" income and expenses is not clear. Some courts use the date of discharge, Mabry v. U.S. Dept. of Educ. Nat'l Pymt. Ctr., et al. (In re Mabry), 398 B.R. 339, 344 (Bankr. E.D. Mo. 2008), while others use the date of trial, Nixon v. Key Educ. Res., et al. (In re Nixon), 453 B.R. 311, 326 (Bankr. S.D. Ohio 2011). Because the Debtor's increase in income occurred before the date of discharge in this case, the outcome is the same under either analysis.

since the petition date shows that he does have the ability to increase his income. The Debtor's testimony also shows he has the ability to become a regional pilot in approximately five years which would result in another significant increase in income. The focus of the Debtor's attention is the difficulty he perceives in becoming a "legacy" pilot with airlines such as Delta, United or American. But whether the Debtor can become a Delta pilot is not the test. He may not make $300,000, but he is presently making over $50,000 a year and has the very real capability to make $70,000 to $100,000 plus in the next five to ten years. While the Debtor sees an increase in regional airlines as a negative for his opportunity to become a legacy pilot, the Court perceives it as a positive for the opportunity to become a pilot at a regional airline. The Court concludes the Debtor has not carried his burden of proof that he has a persistent inability to make payments on his student loans.

### C. Good Faith Efforts to Repay the Loan

The final prong of the Brunner test requires the court to examine the debtor's good faith efforts to repay student loans. A good faith analysis "requires the court to consider the debtor's efforts to obtain employment, maximize income, and minimize expenses." Kidd v. St. Loan Xpress, Inc. (In re Kidd), 472 B.R. 857, 862 (Bankr. N.D. Ga. 2012). This inquiry "is to be guided by the understanding that undue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his reasonable control." Faish, 72 F.3d at 306.

There is a split among courts as to the impact of a debtor's failure to consider enrollment in a repayment plan on the good faith analysis under the Brunner test. Some courts consider the issue dispositive,

others refer to it as a "significant factor", and others attribute little weight to it at all. See Crawley v. Educ. Cred. Mgmt. Corp. (In re Crawley), 460 B.R. 421 (Bankr. E.D. Pa. 2011). The Eleventh Circuit considers it to be a factor that is not outcome determinative, with its weight depending on the circumstances of the case. See In re Mosley, 494 F.3d 1320, 1327 (11th Cir. 2007) (rejecting the per se view that a debtor cannot show good faith when not enrolled in a repayment plan); see also Johnson v. Educ. Cred. Mgmt. Corp. (In re Johnson), 299 B.R. 676, 682 (Bankr. M.D. Ga. 2003) (while participation in an income-based repayment plan would be indicative of good faith, failure to participate in such a plan was not necessarily bad faith, depending on the circumstances).

Another factor in determining the Debtor's good faith is whether the Debtor made payments on the loans. This factor is not per se determinative either as the court should look at debtor's financial history and employment history to attempt to figure out why no payments have been made. If the evidence shows the Debtor made serious efforts to "obtain employment, maximize income, and minimize expenses", Kidd, 472 B.R. at 862, then the court can find good faith even in the absence of any repayment. Douglas v. Educ. Cred. Mgmt. Corp. (In re Douglas), 366 B.R. 241 (Bankr. M.D. Ga. 2007); Waterston v. Penn. Higher Educ. Asst. Agency (In re Waterston), 2002 WL 31856714, at *8 (Bankr. E.D. Pa. 2002).

It appears from the evidence that the Debtor legitimately did not have sufficient funds for several years to make payments on his student loans, so the Court does not conclude the Debtor acted in bad faith prior to the petition date by failing to make payments on the loans. However, now that the Debtor has received an increase in his income of almost double his

pre-petition wages, he is not acting in good faith in failing to make any payments on his student loans.

## CONCLUSION

The Court concludes the loans held by ECMC and NCLST are loans that are non-dischargeable under 11 U.S.C. § 523(a)(8) and the Debtor has failed to carry his burden that such non-dischargeability imposes an undue hardship on him. Judgment is therefore entered for the Defendants.